UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JUAN MARTINEZ-LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 C 7301 |
| | ) | |
| CHRIS WURTH, CONNIE MENNELA, | ) | Judge Rebecca R. Pallmeyer |
| DILDRED McCOY, ISIAKA ADENIYI, | ) | |
| BARBARA DAVIS, DR. JAMES S. | ) | |
| KAPOTAS, and Dr. LUKE C. KOPULOS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER AND OPINION

Plaintiff Juan Martinez-Lopez alleges that Defendants[1] James Kapotas, Luke Kopulos, Barbara Davis, and Dildred McCoy provided constitutionally inadequate medical treatment for a knee injury he sustained while held as a pretrial detainee at the Cook County Jail. *See* 42 U.S.C. § 1983. The Defendants' motion for summary judgment is now before the court. For the following reasons, Defendants' motion for summary judgment [72] is granted.

## BACKGROUND[2]

In June 2016, while held at the Cook County Jail, Plaintiff fell from his bunk and injured his lip and his right knee. (Defs.' Local Rule 56.1 Statement of Facts ("Defs.' SOF") [73] ¶¶ 2, 5.) On that same day, Plaintiff was taken to the jail's dispensary, and Nurse Isiaka Adeniyi referred

---

[1] Plaintiff alleged the same claims against Defendants Chris Wurth, Connie Mennella, and Isiaka Adeniyi. Defendants Wurth and Mennella were dismissed by an earlier ruling of this court [46]. Defendants argue that Defendant Adeniyi must also be dismissed because he was never served. (*See* Mot. for Summ. J. ("MSJ") [74] at 3 n.1.) Plaintiff, now represented by counsel recruited by the court, did not respond to this argument, nor did Plaintiff suggest that he had good cause for failing to serve Defendant Adeniyi. *See* FED. R. CIV. P. 4(m). Accordingly, Isiaka Adeniyi is dismissed as a Defendant.

[2] Plaintiff did not submit an additional statement of facts pursuant to Northern District of Illinois Local Rule 56.1. Plaintiff also did not respond to Defendants' Local Rule 56.1 statement of material facts. Accordingly, Defendants' properly supported statements of fact are deemed admitted and the court draws the information in this Section from Defendants' factual submissions. *See* N.D. Ill. L.R. 56.1(b)(3)(C).

Plaintiff to Cermak Health Services ("Cermak"), an on-site medical facility. (*Id.* ¶ 5.) At Cermak, Dr. Fayez Mekhael prescribed ibuprofen for pain and bacterin, a topical antibacterial gel, for Plaintiff's lip injury. (*Id.* ¶ 6.) About two months later, in August 2016, Plaintiff complained of knee pain and had an appointment with Defendant Barbara Davis, a Physician Assistant at Cermak's primary care clinic. (*Id.* ¶ 7.) Davis examined Plaintiff's knee, ordered an x-ray which was completed that same day, and referred Plaintiff to Cermak's orthopedic clinic for more specialized care. (*Id.* ¶¶ 8, 10.) Defendant Luke Kopulos later read the results of this x-ray and conveyed his interpretation to the treating physician (Defendants do not identify this physician), who diagnosed Plaintiff with a fractured patella with a small joint effusion.[3] (*Id.* ¶ 13.)

In September 2016, Plaintiff attended an appointment with orthopedic specialists Dr. Korey Partenheimer and Dr. Benjamin Bruce of John Stroger Hospital's orthopedic outpatient surgery clinic. (*Id.* ¶ 14.) Stroger Hospital ("Stroger") is off-site, but jail detainees may be referred there by on-site physicians for more advanced care than can be provided at Cermak. (*Id.* ¶ 3.) If, for example, a detainee has an orthopedic condition that may require surgery, the detainee is referred to Stroger for further evaluation by orthopedic specialists at the orthopedic surgery clinic. (*Id.* ¶ 12.) Plaintiff complained of knee pain, and Dr. Partenheimer ordered an additional x-ray of Plaintiff's knee, which showed signs of healing. (*Id.* ¶ 16.) Dr. Partenheimer also discussed with Plaintiff his opinion that Plaintiff did not need a brace, and scheduled a follow-up visit in eight weeks for additional x-rays and evaluation. (*Id.* ¶ 17.) Later in September 2016, Plaintiff again complained of knee pain in a visit with Defendant Davis. (*Id.* ¶ 18.) Davis performed another examination and ordered additional pain medication for Plaintiff. (*Id.* ¶ 19.) Plaintiff's medical

---

[3] Kopulos interpreted Plaintiff's CT scans on November 14, 2016 and July 3, 2018, and x-rays on September 1, 2016, September 13, 2016, November 9, 2016, March 22, 2017, December 28, 2017, and June 27, 2018. (Kopulos Decl. ¶¶ 5–12, Ex. 2 to Defs.' SOF.) The court notes that knee effusion, sometimes referred to as "water on the knee" occurs when excess fluid accumulates in or around the knee joint. https://www.medicalnewstoday.com/articles/187908 (last visited March 31, 2020).

records from that visit show Davis's awareness that the doctors at the orthopedic surgery clinic recommended against surgery. (*Id.*; Med. R. at PageID #:358, Ex. 5 to Defs.' SOF.)

Defendant Kapotas, an orthopedic specialist at Cermak's orthopedic clinic, had his first visit with Plaintiff on November 9, 2016. (Defs.' SOF ¶ 28.) Kapotas diagnosed Plaintiff as having a non-displaced patellar fracture, which Defendants explain to mean that the two pieces of the patella were not significantly separated. (*Id.*) Kapotas ordered a CT scan, prescribed ibuprofen for Plaintiff's ongoing pain, and set a follow-up appointment for two weeks later. (*Id.*) Plaintiff was still experiencing knee pain, however, and complained for the first time at an appointment with Davis on November 21, 2016, that his knee felt unstable. (*Id.* ¶ 30.) Davis ordered a soft brace and a cane for Plaintiff. (*Id.*) Defendant Davis referred Plaintiff back to the orthopedic clinic after an appointment on December 16, 2016, but noted in Plaintiff's medical records that his condition was improving. (*Id.* ¶ 31.)

Plaintiff returned to Cermak's orthopedic clinic on December 21, 2016, where he saw Manisha Patel, a Physician Assistant. (*Id.* ¶ 33.) Patel evaluated Plaintiff's CT scan and discussed with Dr. Kapotas concerns regarding the length of time it was taking for Plaintiff's fracture to heal. (*Id.*) Kapotas and Patel decided to again refer Plaintiff to the orthopedic surgery clinic at Stroger for a second opinion. (*Id.* ¶ 34.) Stroger medical personnel[4] again did not recommend surgery, but did recommend physical therapy and testing of Plaintiff's vitamin D levels because low levels of vitamin D can delay bone healing. (*Id.* ¶¶ 35–36; *see* Med. R. at PageID #:331.) As a result, Plaintiff began physical therapy; Kapotas also tested Plaintiff's vitamin D levels, which were in fact low, and prescribed vitamin D supplements. (Defs.' SOF ¶¶ 37–38.)

Plaintiffs patellar fracture began to heal after he started taking vitamin D. Plaintiff continued to complain of pain at a visit with Kapotas on March 22, 2017, but Plaintiff was able by

---

[4] Defendants do not identify the individual who saw Plaintiff on January 26, 2017, but it appears from Plaintiff's medical records that this appointment was with Manju J. Thomas, a Certified Nurse Practitioner. (Med. R. at PageID #:331.)

then to do straight leg raises. (*Id.* ¶ 40.) Elamma Chollampel, a Certified Nurse Practitioner at the Cermak orthopedic clinic, in consultation with Kapotas, ordered further x-rays on April 26, 2017. (*Id.* ¶ 42.) These x-rays showed Plaintiff's patellar fracture had healed, but Chollampel and Kapotas instructed Plaintiff to continue physical therapy, prescribed ibuprofen for pain, and ended vitamin D treatment because the fracture had healed. (*Id.* ¶ 42.) Plaintiff nonetheless continued to complain of knee pain during visits with Davis in May and July 2017. (*Id.* ¶¶ 43–46.) Davis prescribed additional pain medication and referred Plaintiff for another appointment at the Cermak orthopedic clinic in May, but in July informed Plaintiff that he would not need further appointments with the orthopedic specialists because the fracture had healed. (*Id.* ¶¶ 43, 45–46.)

In October 2017, when Plaintiff was still complaining of pain and requesting a knee brace, Davis referred Plaintiff back to the Cermak orthopedic clinic to consider a knee brace and further vitamin D supplementation. (*Id.* ¶ 50.) Plaintiff had another appointment in December 2017, when Davis gave Plaintiff a knee "sleeve" and ordered another x-ray. (*Id.* ¶ 51.) Davis noted in medical records from this appointment that Plaintiff continued to walk with a cane. (*Id.* ¶ 52; Med. R. at PageID #:370.) Plaintiff's last appointment with Davis was in June 2018; at that time, Davis ordered another knee sleeve, the use of a cane, and pain medication. (Defs.' SOF ¶ 54.) Plaintiff did not see Dr. Kapotas again until June 2018. (*Id.* ¶ 56.) An x-ray taken at this visit showed that Plaintiff's patellar fracture had healed. (*Id.*) Kapotas ordered a CT scan for a more detailed view of the knee, and this scan, taken on July 3, 2018, also showed that the fracture had healed without complication. (*Id.* ¶¶ 57, 59.) Kapotas recommended a cane for stability and prescribed additional pain medication. (*Id.*) Plaintiff returned to the Cermak orthopedic clinic on July 11, 2018 for an appointment with Patel, who noted his continued complaints of pain. (*Id.* ¶ 58.) Patel referred Plaintiff for more physical therapy after consultation with Kapotas. (*Id.* ¶ 61.)

Plaintiff filed his first grievance complaining that he was not receiving treatment for his knee injury on October 20, 2016. (*Id.* ¶ 20.) Defendant Dildred McCoy collected and processed

4

this grievance (*id.* ¶ 22), and a medical technician responded by listing the appointments scheduled to address Plaintiff's injury. (*Id.* ¶ 27.) Plaintiff did not appeal the response to his first grievance despite having fourteen days from the date of the response to do so. (*Id.* ¶¶ 24–25.) McCoy processed five additional grievances filed by Plaintiff but noted in her declaration that some of Plaintiff's complaints were coded as "non-grievances" because they did not comply with the jail's grievance policy. (McCoy Decl. ¶ 3, Ex. 4 to Defs.' SOF.) Specifically, complaints that are duplicative—substantively the same as an issue that was grieved but not appealed—are coded as "non-grievances" and cannot be appealed, although they are still processed and receive responses. (*Id.* ¶¶ 3–5.) Plaintiff's knee injury-related complaints filed on October 20, 2016, October 28, 2016, and July 30, 2017, were treated as grievances but Plaintiff did not appeal any of them. (*Id.* ¶ 4; Grievance R. at PageID #:254–258, 275–76, Ex. 6 to Defs' SOF.) Because Plaintiff did not appeal the earlier grievances, McCoy coded the later duplicative grievances, filed on November 9, 2016, November 10, 2016, and December 4, 2016, as "non-grievances" that could not be appealed. (*Id.*; Grievance R. at PageID #:259–71.) The appeals section of the grievance response form was crossed out on each of the responses to Plaintiff's "non-grievances." (Grievance R. at PageID #:259–71.) Plaintiff states that he does not speak English well, so other individuals helped him translate his grievances from Spanish. (*See id.* at PageID #:275; MSJ Resp. [80] at 3.)

In this court, Plaintiff alleges that Defendants Davis, Kapotas, Kopulos, and McCoy provided inadequate medical treatment for his knee fracture in violation of his constitutional rights. *See* 42 U.S.C. § 1983. Defendants move for summary judgment, arguing that Plaintiff has failed to prove that any of their conduct was objectively unreasonable. Nor, they contend, has Plaintiff provided evidence that his treatment caused him any harm. Finally, Defendants assert that Plaintiff failed to exhaust the Cook County Jail's available administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"). *See* 42 U.S.C. § 1997e(a).

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The court "view[s] the record in the light most favorable to [the nonmoving party], and draw[s] all inferences in his favor." *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). Importantly, however, the court's "favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Additionally, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; FED. R. CIV. P. 56(c). In such situations, there is no issue for trial because a "dispute about a material fact is 'genuine'" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**DISCUSSION**

Defendants seek summary judgment on two bases. First, that Martinez-Lopez failed to exhaust the administrative remedies available to him at the Cook County Jail regarding his healthcare grievances. Second, that Plaintiff has not shown that the Defendants' conduct was objectively unreasonable, and therefore that he received constitutionally inadequate medical treatment for his knee injury. Because exhaustion is a threshold issue that should be addressed before proceeding to any disposition on the merits, the court addresses that issue first. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014).

**I.     Exhaustion of Plaintiff's Administrative Remedies**

The PLRA provides that a prisoner must "exhaust all available administrative remedies before suing in federal court." *Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015); *see also* 42

U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner . . . until such administrative remedies as are available are exhausted."). To fulfill this requirement, an inmate must comply with the procedures and deadlines established by the jail's policy. *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016). That is, "a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). The Seventh Circuit takes "a strict compliance approach to exhaustion." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Thus, a prisoner "must properly use the prison's grievance process," and if he fails to do so, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Id.*

An inmate need only exhaust the administrative remedies that are "available" to him. *Thomas*, 787 F.3d at 847. A remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ramirez v. Young*, 906 F.3d 530, 535 (7th Cir. 2018) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016)). In *Ross*, the Supreme Court offered examples of situations in which administrative remedies are unavailable: when prison officials are "consistently unwilling to provide any relief to aggrieved inmates," when the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use," or when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60. *Ramirez* also recognized that "remedies are available only if a prisoner has been notified of their existence," and if the existing remedial processes are "communicated in a way reasonably likely to be understood." *Ramirez*, 906 F.3d at 535; *see also King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015) ("Prisoners are required to exhaust grievance procedures they have been told about, but not procedures they have not been told about. They are not required to divine the availability of other procedures.").

As an initial matter, Plaintiff objects to the fact that the Defendants raised his failure to exhaust administrative remedies for the first time in their motion for summary judgment. (MSJ

7

Resp. at 2.) Exhaustion is an affirmative defense, and the burden of proof is on the Defendants. *Dole*, 438 F.3d at 809; *Jones v. Bock*, 549 U.S. 199, 219 (2007). Ordinarily, affirmative defenses must be raised in the pleadings. *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) (citing FED. R. CIV. P. 8(c)). The Seventh Circuit has held, however, that "a delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result." *Curtis*, 436 F.3d at 711. Thus in *Curtis v. Timberlake*, the court found that the defense could be raised for the first time at summary judgment because the plaintiff was not prejudiced—"he was aware of the exhaustion issue even when he filed his complaint, and he confronted the defense in responding to the motion for summary judgment." *Id.* In *Hess*, the court likewise found no prejudice when the plaintiffs "fully understood the exhaustion requirement, as they explicitly stated in their complaint that they had exhausted their administrative remedies," and in rejecting a claim that the plaintiffs could have voluntarily dismissed their suit to pursue exhaustion, the court explained that "they had ample time [to voluntarily dismiss their case] during the four months that followed before the district court granted the [defendant's] motion [for summary judgment]." *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 730 (7th Cir. 2007). Plaintiff here did not indicate his awareness of the exhaustion issue when he filed his complaint—the complaint mentions that he filed numerous grievances but does not allege exhaustion (3d Am. Compl. [36] ¶ 25)—but Defendants raised the exhaustion challenge in their opening brief on summary judgment. (*See* MSJ at 21.) Plaintiff had a full opportunity to address the issue and, if he needed further discovery on the issue, he could have invoked FED. R CIV. P. 56(d).

Plaintiff further notes the Seventh Circuit's "recommendation" that district courts conduct an evidentiary hearing before deciding whether a plaintiff exhausted administrative remedies, "and permit[ ] whatever discovery relating to exhaustion [it] deems appropriate." (MSJ Resp. at 2); *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). Where there are no factual disputes regarding exhaustion, however, a *Pavey* hearing is not required. *See Wagoner v. Lemmon*,

778 F.3d 586, 588 (7th Cir. 2015) ("Often exhaustion (or its lack) will be apparent, but when it is not, the district court must hold an evidentiary hearing to resolve the question."). Plaintiff has cited *Pavey*, but does not explicitly request an evidentiary hearing. In addressing the issue of exhaustion, the court will not decide any unresolved genuine factual disputes.

### A. The Appealable Grievances

Plaintiff filed six grievances related to the medical treatment he received for his knee injury while he was held at the Cook County Jail: two in October 2016, two in November 2016, one in December 2016, and the last in July 2017. (*See* Grievance R.) The court addresses, first, the grievances Plaintiff could have appealed, the two October 2016 grievances and the July 2017 grievance. An inmate in the Cook County Department of Corrections ("CCDOC") wishing to grieve an issue must file a grievance within 15 days of the event he is grieving. (*See id.*) Once a Correctional Rehabilitation Worker ("CRW"), like Defendant McCoy, processes the grievance and the relevant official provides a response, the grievance is returned to the detainee. (Defs.' SOF ¶ 23.) If a detainee is dissatisfied with the response, he has 14 days to appeal the grievance using the appeal section of the grievance form that was returned to him. (*Id.* ¶ 24.) A detainee must appeal the grievance to properly exhaust his administrative remedies. (*Id.*) Instructions for filling out the grievance form are on the form itself and are written in both English and Spanish. (*Id.* ¶ 21.) In the section of the grievance form where an inmate would request an appeal, the form warns, in both English and Spanish, that "[t]o exhaust administrative remedies, appeals must be made within 14 days of the date the inmate received the response." (*See, e.g.,* Grievance R. at PageID #:256.)

CCDOC policy required Plaintiff to appeal the responses to his October 2016 and July 2017 healthcare grievances to exhaust his administrative remedies. *See Hernandez*, 814 F.3d at 843. Plaintiff admits that he did not appeal any of his healthcare grievances. (*See* MSJ Resp. at 2.) And the blank appeals sections of Plaintiff's grievances corroborate his failure to appeal. *See Bryant v. Sczerua*, No. 16 CV 2180, 2017 WL 1049845, at *3 (N.D. Ill. Mar. 20, 2017). Plaintiff

9

therefore failed to exhaust his administrative remedies, so long as they were "available." *See Dixon v. Page*, 291 F.3d 485, 489 (7th Cir. 2002) (affirming a prisoner's failure to exhaust when, despite denial of the requested relief, he did not appeal to the next level of review). Citing *Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013), Plaintiff argues that he has, in fact, satisfied the exhaustion requirement because he filed multiple grievances on the same issue, and he claims the Seventh Circuit "has long recognized that multiple grievances on the same issue are sufficient to meet the exhaustion requirement." (MSJ Resp. at 3 (citing *Turley*, 729 F.3d at 650).) But *Turley* does not support such a proposition. Instead, the court there explained that "[i]n order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue . . . if the objectionable condition is continuing," and reiterated the general rule that a "prisoner must exhaust his grievances in accordance with prison procedural rules." *Turley*, 729 F.3d at 649–50. Here, the CCDOC procedural rules require detainees to appeal grievances in order to exhaust their administrative remedies; filing multiple grievances on the same issue does not satisfy that requirement.

Plaintiff also suggests that his language barrier means that the grievance process was not available to him. Specifically, Plaintiff speaks Spanish and has limited English comprehension, and notes that on the one appeal he did file (not related to medical issues), there was a notation that it was translated from Spanish by someone named Mrs. Mena. (MSJ Resp. at 3.) Accordingly, Plaintiff argues, "[i]t may be inferred from this transaction that the Plaintiff had a poor understanding of what an appeal was and how to perfect one." (*Id.*) True, an inmate's language barrier may mean that the prison's administrative remedies are unavailable because "existing remedial processes are available only if communicated in a way reasonably likely to be understood." *Ramirez*, 906 F.3d at 535. For example, in *Ramirez*, "no one at [the prison] ever remedied the failure to communicate the grievance process to [the plaintiff] despite widely shared knowledge of his lack of English proficiency," and the "record show[ed] that nothing gave [the

10

plaintiff] even a clue about the grievance process." *Id.* at 536–37.  As a result, the court concluded that administrative remedies were not available to the plaintiff.  *Id.* at 538.

This case differs in two ways.  First, Plaintiff states only that it "may be inferred" from the fact that he was assisted when completing the appeal form that he "had a poor understanding of what an appeal was and how to perfect one." (MSJ Resp. at 3.)  But Plaintiff had no need to rely on inferences; if he genuinely did not understand the grievance process, he was free to include a declaration to this effect in the record.  *See Lewis*, 909 F.3d at 866 (explaining that on summary judgment the court cannot credit "inferences that are supported by only speculation or conjecture").  Second, a prisoner's subjective unawareness of a grievance procedure does not excuse his noncompliance "so long as the prison has taken reasonable steps to inform the inmates about the required procedures." *Ramirez*, 906 F.3d at 538.  Unlike in *Ramirez*, in this case the grievance and appeal forms available to Plaintiff had instructions written in both English and Spanish.  And the appeal form specifically stated, in Spanish, that to exhaust administrative remedies, Plaintiff must appeal.  Cook County Jail has taken a reasonable step to inform detainees, including those who speak only Spanish, about the required procedures.  In sum, the court finds that Plaintiff failed to exhaust his administrative remedies because there is no dispute that he failed to appeal his October 2016 and July 2017 grievances as required by Cook County Jail policies, and nothing in the record establishes that the administrative remedies were not available to him.

### B. The Non-Appealable "Non-Grievances"

The court notes that based on its own review of the record, Defendant McCoy classified Plaintiff's three complaints filed in November and December 2016 as non-grievances.  (*See* McCoy Decl. ¶ 3.)  These non-grievances asserted essentially the same complaints about the medical treatment for his knee as Plaintiff's other three grievances.  Plaintiff received one response to his two November 2016 non-grievances, and a response to his December 2016 non-

grievance, but was not permitted to appeal them; indeed the appeal portion of the response forms was crossed out. (*See, e.g.,* Grievance R. at PageID #:261.)

Neither party explicitly raised this issue on summary judgment, but in his response brief, Plaintiff suggests that filing multiple grievances on the same issue may be sufficient to exhaust administrative remedies. (MSJ Resp. at 2–3.) This argument is potentially relevant to the non-grievances, so the court will address the issue for completeness. As discussed above, a Cook County Jail detainee cannot exhaust administrative remedies for grievances through repeat filing, but other courts within this Circuit have explained that the exhaustion requirement may be satisfied by repeat filings of *non-grievances*. *See Lyles v. Gambino*, No. 14 CV 1406, 2019 WL 2511868, at *9 (N.D. Ill. June 17, 2019) (listing cases). The grievance form itself states that "[w]hen a grievance issue is processed as a NON-GRIEVANCE (REQUEST), an inmate may re-submit the grievance issue after 15 days to obtain a 'Control Number' if there has been no response to the request or the response is deemed unsatisfactory" (*see, e.g.,* Grievance Form at PageID #:260), suggesting that the institution contemplated some form of exhaustion of non-grievances by way of repeat filing.

Like others in this Circuit, this court concludes that Plaintiff did adequately exhaust administrative remedies with respect to these non-grievances. *See Dole*, 438 F.3d at 809 (explaining that the burden of proof is on the defendants to show a failure to exhaust administrative remedies). First, it is not clear that repeat filing was an "available" remedy to Plaintiff under the circumstances because the explanation on the form does not clearly explain that resubmission is necessary to exhaust administrative remedies, and the normal appeals process was not permitted. *See Coleman v. Dart*, No. 17 C 2460, 2019 WL 670248, at *8 (N.D. Ill. Feb. 19, 2019) (listing cases). Second, it is not clear whether Plaintiff's December 2016 non-grievance could be considered a repeat filing in compliance with the jail's grievance process. Neither party explained this point in their briefs, but Plaintiff may have successfully exhausted administrative remedies for his November 2016 non-grievances. Ultimately, however, whether

Plaintiff exhausted the remedies available to him for his non-grievances is immaterial for purposes of Defendants' motion for summary judgment because Plaintiff's claim of constitutionally inadequate medical care fails on the merits.[5]

## II. Merits of Plaintiff's Claim of Inadequate Medical Care

Plaintiff alleges that Defendants Davis, Kapotas, Kopulos, and McCoy provided him constitutionally inadequate medical care after he fell from his bunk at the Cook County Jail and fractured his patella. In seeking summary judgment, Defendants contend that Plaintiff has produced no evidence showing that the Defendants' treatment decisions were objectively unreasonable, nor that Defendants acted with the requisite mental state to find a constitutional violation. (MSJ at 4.) Defendants also contend that Plaintiff produced no evidence showing a causal connection between the provided course of treatment and any injury Plaintiff suffered.[6] (*Id.*) Plaintiff responds that there is a genuine dispute of material fact regarding whether the decision to treat his fractured patella without surgery was constitutionally adequate. (MSJ Resp. at 4.) As explained below, the court is not persuaded that the possibility that surgical treatment of Plaintiff's patellar fracture could have been more effective is sufficient for his claim to survive this motion.[7]

During all times relevant to Plaintiff's claim of inadequate medical treatment, he was a pretrial detainee housed at the Cook County Jail. The Fourteenth Amendment's Due Process Clause, not the Eighth Amendment's prohibition of cruel and unusual punishment, governs challenges to a pretrial detainee's conditions of confinement, including access to adequate

---

[5] The PLRA does not impose a total exhaustion requirement. *Jones,* 549 U.S. at 223–24. Accordingly, the court need not dismiss the entire action as a result of Plaintiff's failure to exhaust the administrative remedies available for some of his grievances.

[6] The court does not address Defendants' causation argument because it finds that none of the Defendants' conduct was objectively unreasonable as required to show that Plaintiff's constitutional rights were violated.

[7] The court notes that it does not appear that Plaintiff requested surgery in any of his grievances, again raising the issue of whether Plaintiff exhausted administrative remedies.

13

medical care. *See Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2473 (2015); *see also Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (explaining that medical care is a condition of confinement). This is because pretrial detainees, unlike convicted prisoners, may not be punished. *Id.* at 2475; *see also Schall v. Martin*, 467 U.S. 253, 269 (1984). The Supreme Court in *Kingsley* applied a standard of objective reasonableness to its review of a pretrial detainee's excessive force claim—"a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose," provided that the force was "purposefully or knowingly used against him." *Kingsley*, 576 U.S. at 2473–74.

The Seventh Circuit applied *Kingsley*'s objective inquiry to claims of constitutionally inadequate medical treatment by pretrial detainees in *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018), replacing the Eighth Amendment's deliberate indifference standard. To succeed on a claim alleging inadequate medical care, a pretrial detainee must show, first, that "the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [a patient's] case," because "negligent conduct does not offend the Due Process Clause." *Id.* at 353; *see also Daniels v. Williams*, 474 U.S. 327, 330–31 (1986). Second, a pretrial detainee must show that the defendant's conduct was objectively unreasonable. *Id.* at 354. "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018).

In this motion, all Defendants seek summary judgment in their favor, arguing that each of them acted objectively reasonably. In his response opposing the motion, Plaintiff addresses only the conduct of Dr. Kapotas. Plaintiff has therefore abandoned his claim of inadequate medical care against Defendants Davis, Kopulos, and McCoy. *See Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 641 (7th Cir. 2019) ("[Defendant's] motion sought summary judgment on

all claims. In opposing summary judgment in the district court, [plaintiff] failed to assert [his retaliation claim]. . . . The district court was not required to address a claim or theory that plaintiff did not assert."); *Nichols v. Michigan City Plan Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Nextel specifically requested summary judgment on the quantum meruit claim. Keck Garrett, however, did not defend that claim in its reply to Nextel's motion for summary judgment. By failing to present its argument to the district court, Keck Garrett abandoned its claim.").

Aside from the issue of waiver, Plaintiff's sole response to Defendants' motion for summary judgment regarding the objective reasonableness of his medical treatment is that there is a genuine issue of material fact regarding whether Plaintiff should have received surgery to treat his patellar fracture, rather than the non-surgical course of treatment chosen by Dr. Kapotas. (MSJ Resp. at 4.) Plaintiff cites to an excerpt from a 2011 article in the Journal of the American Academy of Orthopaedic Surgeons discussing treatment options for patellar fractures. (*Id.*) The journal article states that "[n]on-surgical management is indicated for non-displaced fractures with an intact extensor mechanism," and that "[s]urgical fixation is recommended for fractures that either disrupt the extensor mechanism or demonstrate >2 to 3 mm step-off and >1 to 4 mm of displacement." (*Id.* (citing Stuart J. Melvin & Samir Mehta, *Patellar Fracture in Adults*, 19 J. AM. ORTHOPAEDIC SURGEONS 198 (2011)).) Plaintiff points out that, although Dr. Kapotas claims to have "diagnosed a nondisplaced patella fracture," Plaintiff's medical records cite an x-ray from September 1, 2016 showing a "fracture with minimal displacement."[8] (*Id.*) And, Plaintiff notes, minimal displacement is not the same as no displacement, so surgery may have been the best

---

[8] Plaintiff also points out that one of his CT scans showed an "abnormal morphology" of the medial meniscus body but does not explain how this relates to the course of treatment for his fractured patella. (MSJ Resp. at 4; *see also* Med. R. at PageID #:328.)

15

course of treatment. (*Id.*) The court is not persuaded that Plaintiff's argument warrants denial of summary judgment.

The court notes, first, that Plaintiff submitted no statement of additional facts, *see* N.D. Ill. L.R. 56.1(b)(3)(C), and the full journal article is not otherwise in the record. The court would not ordinarily consider such a submission as evidence in ruling on Defendants' motion for summary judgment. "[U]nsupported statements in a legal brief are not evidence that the [c]ourt can consider at summary judgment." *Boyce v. Obaisi*, No. 13 C 5746, 2015 WL 5462137, at *2 (N.D. Ill. Sept. 16, 2015) (citing *I.N.S. v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984); *United States v. Chapman*, 694 F.3d 908, 914 (7th Cir. 2012)). And "facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion." *Boyce*, 2015 WL 5462137, at *2 (quoting *Beard v. Don McCue Chevrolet, Inc.*, No. 09 C 4218, 2012 WL 2930121, at *5 (N.D. Ill. July 18, 2012)). More importantly, Plaintiff offers no evidence, such as proposed expert testimony, that the Melvin/Mehta article establishes the correct standard of care applicable to Plaintiff's injury. Nor is there any evidence that surgical treatment would have caused his knee to heal faster or with less pain.

Second, even if the court were to accept the journal article as evidence on the issue of whether Plaintiff received constitutionally inadequate medical care, the article does not, in fact, raise a genuine issue of fact regarding whether Defendants' failure to surgically treat Plaintiff's patellar fracture was objectively unreasonable. *See Miranda*, 900 F.3d at 353. There is no evidence that Defendants McCoy, Davis, or Kopulos had authority to recommend or perform knee surgery, nor is there any evidence that the chosen non-surgical course of treatment should have raised a red flag for these individuals. "[A]n individual must be personally responsible for a constitutional deprivation in order to be liable," but "personal responsibility is not limited to those who participate in the offending act." *Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015). Instead, "[l]iability extends to those who, having a duty under the Constitution to the plaintiff, act or fail to act with a deliberate or reckless disregard of plaintiff's constitutional rights," or "if the

conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Id.* at 440 (quotations omitted). Plaintiff points to no evidence of Defendants McCoy, Davis, or Kopulos's responsibility for any decision regarding the appropriateness of surgery. *See Turner v. Paul*, No. 19-2225, 2020 WL 1471845, at *3 (7th Cir. Mar. 2, 2020) (finding that the defendants' conduct was objectively reasonable because they did not have the authority to schedule or perform a required surgery, and plaintiff's medical records indicated that a surgery or appointment was on his schedule every time the defendants saw him).

Defendant McCoy, in her role as a CRW, had no authority to refer detainees for any sort of medical treatment. (Defs.' SOF ¶ 26; McCoy Decl. ¶ 6.) Instead, she was responsible for collecting and processing detainee grievances. (McCoy Decl. ¶¶ 2–3.) McCoy stated in a declaration that a medical technician responded to each of Plaintiff's healthcare grievances, explaining that Plaintiff had numerous past and future medical appointments and had received x-rays and pain medication. (*Id.* ¶ 7.) As a non-medical staff member, McCoy was entitled to rely on medical personnel to "determine the proper course of care" so long as they do not ignore an inmate. *McCann*, 909 F.3d at 888; *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("[T]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so."). Plaintiff does not suggest that McCoy failed to properly process his grievances, nor that her reliance on the grievance responses was "blind or unthinking." *See Berry*, 604 F.3d at 443. Indeed, the record suggests that the grievances McCoy processed were enough to show that the jail's medical staff were responsive to Plaintiff's complaints.

Defendants Davis and Kopulos are physicians, but like McCoy, had no authority to recommend orthopedic surgery. *See Turner*, 2020 WL 1471845, at *3. Davis was Plaintiff's primary care physician at the Cermak primary care clinic, and the record shows that Davis examined Plaintiff's knee several times, ordered x-rays, provided medication to treat his pain,

17

prescribed braces and a cane, and referred Plaintiff to the orthopedic clinic for specialty care that she could not provide. (Davis Decl. ¶ 5, Ex. 3 to Defs.' SOF.) Davis has training in orthopedic medicine but stated in her declaration that specific treatment decisions for orthopedic issues are made by the medical professionals at the orthopedic clinic. (*Id.* ¶ 4.) Davis, for example, could and did order pain medication for Plaintiff (*id.* ¶ 6), but the orthopedic clinic personnel made the decisions to refer Plaintiff to physical therapy rather than operate on his knee and to order vitamin D supplementation to help with bone healing. (*Id.* ¶ 5.) Defendant Kopulos is a diagnostic radiologist (Defs.' SOF ¶ 74); his sole involvement in Plaintiff's treatment was reading and reporting the results of x-rays and CT scans ordered by Plaintiff's treating physicians. (*Id.* ¶ 75; Kopulos Decl. ¶ 2.) Specifically, Kopulos read six of Plaintiff's x-rays and two of his CT scans between September 2016 and July 2018. (Kopulos Decl. ¶¶ 5–12.) Plaintiff has not explained how any of Kopulos's or Davis's actions led to improper treatment—for example, whether Kopulos incorrectly read or reported test results, or how any of Davis's treatment decisions (aside from failing to provide surgery) were improper. Moreover, there is no indication in the record that Davis and Kopulos were unjustified in relying on the treatment decisions of Dr. Kapotas and the medical professional at Stroger's orthopedic surgery clinic, given their active monitoring of Plaintiff's condition and more specialized knowledge. *Cf. Berry*, 604 F.3d at 443.

That leaves Defendant Kapotas, the only care provider whose conduct Plaintiff addresses in his response to this motion. Plaintiff has presented no evidence that Defendant Kapotas's conduct was objectively unreasonable. As an initial matter, Plaintiff has not shown that a doctor following the guidelines articulated in the journal article cited in his motion in opposition to summary judgment would have ordered surgery under the facts of his case.[9] The journal authors do not recommend surgery in all cases. Instead, they appear to recognize that surgery may be

---

[9] It appears from Dr. Kapotas's declaration that he based his treatment on a similar standard. Kapotas stated that "[i]f the fracture is displaced, meaning a significant gap in the fracture line and a patient cannot actively straighten his knee, surgical intervention might be necessary." (Kapotas Decl. ¶ 6, Ex. 1 to Defs.' SOF.) Neither condition applied to Plaintiff. (*Id.*)

18

appropriate to treat fractures that "either disrupt the extensor mechanism or demonstrate >2 to 3 mm step-off and >1 to 4 mm of displacement." (MSJ Resp. at 4.) Plaintiff cites no evidence of disruption to his "extensor mechanism" nor evidence that the step-off or displacement of his patellar fracture exceeded the limits set forth in the article. More importantly for Plaintiff's constitutional claim, the article demonstrates that the decision to operate under the circumstances present in his case is a matter of medical judgment. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.").

Defendant Kapotas did not have the unilateral authority to recommend or schedule a surgery for Plaintiff, and he could not perform the operation himself. *See Turner*, 2020 WL 1471845, at *3. Kapotas is an orthopedic specialist but not an orthopedic surgeon. (Defs.' SOF ¶¶ 39.) That is, Kapotas can provide only non-surgical interventions. (Kapotas Decl. ¶ 18.) Plaintiff points to no evidence suggesting that Kapotas's course of treatment was not the result of a considered decision. As Kapotas stated in his declaration, Plaintiff was first seen by Dr. Korey Partenheimer and Dr. Benjamin Bruce at the surgery clinic on September 14, 2016. After they determined that surgery was not needed, Plaintiff had his first appointment with Dr. Kapotas in November 2016. (*Id.* ¶¶ 4–5.) Based on his own examination, Kapotas, too, determined that surgery was not necessary (*id.* ¶ 6), but nonetheless referred Plaintiff back to the orthopedic surgery clinic to get a second opinion on January 26, 2017.[10] (*Id.* ¶¶ 6, 9, 18.) Medical personnel at the surgery clinic again decided that surgery was not appropriate for Plaintiff. (*Id.*) Plaintiff's knee healed properly as a result of the vitamin D treatment and physical therapy, along with the assistance of a cane and a brace and pain medication to reduce Plaintiff's pain. As Kapotas

---

[10] Paragraph 18 of Kapotas's declaration states that the second referral was January 26, 2018, but paragraphs 6 and 9 state that the second referral was on January 26, 2017.

19

noted, however, it was not surprising, in his professional opinion, that Plaintiff would experience some pain from his patellar injury. (*Id.* ¶ 15.)

Kapotas was entitled to rely on the decision of surgical specialists that a non-surgical course of treatment was appropriate. And their view that surgery was not necessary corroborates that Kapotas's course of treatment was not "such a significant 'departure from accepted professional standards or practices' that it was objectively unreasonable." *Williams v. Patton*, 761 F. App'x 593, 597 (7th Cir. 2019) (quoting *Pyles*, 771 F.3d at 409). Plaintiff's claim that surgical treatment was required essentially amounts to a disagreement with the course of treatment chosen by the jail's medical staff, which is not enough to conclude that Kapotas's care was constitutionally inadequate. *Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient."). In sum, Plaintiff has not raised a genuine issue of material fact regarding the adequacy of his medical treatment.

## CONCLUSION

Plaintiff Martinez-Lopez failed to exhaust the administrative remedies available for three of the grievances he filed while held at the Cook County Jail, but Defendants have not met their burden of showing that Plaintiff exhausted the available remedies for his three "non-grievances." Regardless of the issue of exhaustion, Plaintiff Martinez-Lopez forfeited his Section 1983 claims against Defendants Kopulos, Davis, and McCoy, and failed to raise a genuine issue of material fact regarding whether Defendant Kapotas's chosen course of treatment was objectively unreasonable. Accordingly, Defendants' motion for summary judgment [72] is granted.

ENTER:

Dated: March 31, 2020

_____
REBECCA R. PALLMEYER
United States District Judge